Bland, Chancellor.
The petition of the plaintiffs standing ready for hearing, the solicitors of the parties were fully heard and the proceedings read and considered.
Having lately had occasion maturely to consider the nature of an application to order money to be brought into court before the final hearing, (a) it will be here unnecessary to give any further explanations in regard to it. The counsel for the petitioners seemed to think, that the court had, in that case, gone further with the doctrine than had been done in any of the English cases; but, in what particular is not perceived. The English cases are grounded upon an interest in the plaintiff, and an admission in the answer itself, or an admission by reference to a schedule, or to books or documents; or upon an auditor’s report confirmed; because the confirmation of such a report is a judgment of the court. In the late case in this court, the admission was accompanied by a reference to a deed, the construction of which belonged to the court, *267 and which was found to be unambiguous; and to leave no room for the introduction of proof as to its true intent and meaning.
It is a general rule, that a plaintiff may, at any time, without or by withdrawing his general replication, set the case down for final hearing, on bill and answer. But if he does so, he thereby necessarily admits the truth of all the facts set forth in the answer; as well those stated as directly responsive to the bill, as all those new facts and circumstances, pertinent to the matter in controversy, which have been introduced into it by way of avoidance, or as a defence. The reason and utility of this rule are obvious. The plaintiff cannot be permitted to deprive the defendant of the means of sustaining his defence by proof; but if he admits the truth of all the facts alleged by way of defence in the defendant’s answer, he does not do so.- Because a defendant cannot be expected or allowed to make his defence stronger, or better than he himself has stated it; and, therefore, if the plaintiff admits the truth of all those facts set forth as constituting that defence, the defendant can have no cause to complain, nor any pretext for asking to be indulged with any further delay to the prejudice of the plaintiff; since the collecting of proofs in such ease must be altogether unnecessary. (b)
So, in cases of this kind, where the order is proposed to be grounded on the admissions of the defendant. The truth of all the facts alleged in the answer must necessarily be conceded; because the defendant cannot have his answer garbled, or be deprived of the means of sustaining his defence by proof, if the facts alleged by him are denied; and because it is only by the plaintiffs’ granting the truth of the facts alleged by way of defence, that it is rendered wholly unnecessary to adduce proof; and the case becomes so situated, as to be susceptible of being fairly and at once presented to the court, upon facts not liable to be contradicted or explained away at the hearing.
From some expression which fell from the counsel, in the course of the argument, I deem it proper, however, to remark, that in declaring, that all the allegations of the defendant’s answer, in cases of this sort, must be taken to be true, I mean the allegations of pertinent facts, out of which legal or equitable principles may *268 arise, not any mere matter of opinion or idle assertion. In the case before alluded to, (c) the party alleged; first, the validity of the deed; second, the receipt of the money under the deed; and third, that the intention of the deed was, that he should hold the money so received. The two first of those allegations stated, and admitted the truth of the facts upon which the judgment of the court was founded; and the third amounted to no more than an expression of the defendant’s opinion of the intention of the deed, which being erroneous, was therefore passed over unnoticed. But, although parties may be indulged in a brief expression of their opinions as to the law arising out of the facts they set forth; and the doing so may, in many cases, be received as a useful indication of the objects they aim at; yet there is no absolute necessity, in any case, to make any statement or allegation as to the legal consequences of any facts; since it is the peculiar and exclusive duty of the court to pronounce what is the law arising out of any combination of facts which may be regularly brought before it. In this case, and at present, all the allegations of fact contained in the answer of Eleanor Dawson, must be taken to be true, as well those which are immediately responsive to the bill, as those which introduce new facts by way of avoidance and defence.
The petitioners, however, assuming a view of the answer, in relation to the matter now under consideration, which they assert is the correct one, contend, that all the admitted facts necessary to lay a proper foundation for the desired order, are to be found in the answer of Eleanor Dawson, except those set forth in the account settled by1 her with the Orphans Court, a copy of which is exhibited as a part of their petition. And that account, they urge, is now admissible as part of the foundation of the proposed order; as being analogous to a confirmed auditor’s report; and as proof of collateral facts within the meaning of this court’s opinion in the case alluded to. (d) Therefore, if that account should not be deemed admissible, for that purpose, there is, even by the petitioner’s own concession, no just ground for his application, and it will be unnecessary to notice any other matter in relation to it.
The confirmation of an auditor’s report is, in every sense, a judgment of the court. For although it may not constitute a part of the final judgment on the whole case, it is nevertheless always considered as a judgment conclusive of the matter which it affirms, *269 and to which it relates; with some exceptions, subject only to be reheard or revised for similar causes, which would induce the court to rehear or revise any other of its judgments. It has been deemed a sufficient foundation for an order to bring money into court; because it was so conclusive as to the matter in controversy to which it related, in that case and between those parties. But, even considering the settlement of this account, by this executrix Eleanor Dawson, before the Orphans Court, as a judgment of that tribunal; yet it certainly is not a judgment between the parties to this case, upon any point now in controversy between them. Nor can it be received as an admission in a course of judicial proceeding, in direct reference to the matters in controversy in this case, which the parly can neither contradict or explain away at the final hearing. It is, therefore, in no respect, analogous to a confirmed auditor’s report; and, consequently, can furnish no foundation for an order to bring money into court.
But this account, it has been urged, is admissible as proof of collateral facts, which, together with those admitted by the answer, furnish a sufficient ground for the order now asked for. I have said upon a former occasion, that the foundation for such an order must be found in the direct progress of the case; and be such as cannot be afterwards contradicted or explained away. Such- is the general rule; and the reason is obvious. If the court were to stop, or to turn aside from the direct progress of the case to collect proofs, in relation to an interlocutory order respecting any matter, which must, according to the regular course, remain open for proof until the case was set down for hearing, it would thus anticipate the final hearing and decision upon the merits; and involve itself in endless difficulties and contradictions; and be employed in acting and re-acting for no beneficial purpose, or indeed, often in doing the greatest injustice- to the parties.
The only cases in which the court has allowed itself to depart from this general rule, are those which arise between vendors and purchasers. The reason why affidavits are admitted, in such cases, to establish those facts and circumstances which are necessary, in connection with the pleadings, to lay a foundation for an order to bring money into court, has been already sufficiently explained in a late case, (e) This is not such a case; nor is there *270 any thing in it, which can, in any respect whatever, take it out of the general rule, which forbids the court from turning aside, from the direct progress of the case, to attend to the introduction of proofs in relation to any matter involved in a consideration of the merits of the whole case, and which should remain open until the final hearing.
It is, therefore, Ordered, that the order of the 27th of February last, be discharged; and the petition of the complainants be dismissed with costs.
After which commissions were taken out, under which proofs were collected and returned; and the case was brought on for a final decision.
14th April, 1829.
Bland, Chancellor.
This case standing ready for hearing, the solicitors of the parties were fully heard and the proceedings read and considered.
Ann Russell, a resident of London, and a subject of the British monarch, having a large estate and many descendants, some of whom were natives and residents of England, and others residents and citizens of the United States, on the 23d of January, 1796, made her will, and some time after died; in which will is found, among others, the following bequest:
CI give to William Dawson, of Wakefield, in the county of York, and to my said grandson Robert Clerk, their executors, administrators and assigns, the sum of £1,500, upon trust, to invest the same in their or his names or name, in the public stocks or funds, or at interest upon parliamentary, government, or real securities. And to stand possessed of the said last mentioned £1,500, or of the stocks, funds, or securities in or upon which the same shall be invested, upon trust,, to pay and apply the interest and dividends thereof unto and for the sole and separate use of my grandaughter Margaret Russell Clerk, the wife of James Clerk, of Park Hall, in the province of Maryland, in North America, during her natural life. And for which interest and dividends the receipt of the said Margaret Russell Clerk, or of such person or persons as she shall appoint to receive the same shall, notwithstanding her present, or any future coverture, be good discharges. And from and after the decease of the said- Margaret Russell Clerk, then upon trust to assign, transfer and pay the said last mentioned sum of £1,500, or the stocks, funds, or securities in or upon which the same shall be invested as aforesaid, unto all the children of my said grand *271 daughter Margaret Russell Clerk, who shall be living at her death; and who being a son, or sons, shall then have attained, or shall afterwards live to attain the age of twenty-one years; or who being a daughter or daughters shall then have attained the age of twenty-one years, or been married, or shall afterwards live to attain that age, or be married, to be equally divided between such children, if more than one, as tenants in common. But if my said granddaughter Margaret Russell Clerk, shall have only one child living at her death, who being a son, shall then have attained, or shall afterwards live to attain the age of twenty-one years; or who being a daughter, shall then have attained the age of twenty-one years, or been married; or shall afterwards live to attain that age or be married, then upon trust to assign, transfer and pay the said last mentioned sum of £1,500, or the stocks, funds, or securities in or upon which the same shall be invested as aforesaid, unto such only child for his or her own absolute use. And in case my said granddaughter Margaret Russell Clerk, shall have no child or children who shall live to become entitled to the said last mentioned sum of £1,500, or the stocks, funds or securities in or upon which the same shall be invested as aforesaid, unto my grandson John Clerk, for his own absolute use.’
The testatrix in the same will had given a legacy to her granddaughter Eleanor Lee, who was a native, and then a resident of England, and a subject of the British king; and as such incapable of taking real estate in Maryland and Virginia by descent, from several relatives from whom, but for her incapacity, in respect of her alienage, she expected and might obtain a large amount of property in common with her sisters who were citizens of the United States. In reference to this state of things, and to make some indemnity to her grandaughter Eleanor Lee for any loss she might thus sustain, the testatrix Ann Russell added the following codicil to her will:
‘Understanding, that my grandaughters in America, viz. Mrs. Sarah Contee, Miss Ann Lee, and Mrs. Magaret Russell Clerk, intend to contest their sister Eleanor Lee’s right to her share of her grandfather’s, grandmother’s, father’s and mother’s lands and personal estate in Maryland and Virginia, I hope and trust they are not so unnatural; if it prove so, I will and desire, that every shilling I have left them in my said will, be paid my dear Eleanor Lee, added to the legacy I have left her in my will, as a compensation for what she loses by their cruelty; but if they do not contest *272 it, and my dear Eleanor Lee receives an equal share of all the lands and personals belonging to their grandfather, grandmother, fathers and brothers, the legacy I have left in my will to remain good.’ After which, on the 31st of January, 1797, the testatrix added the following words to the codicil, £My grandaughter Eleanor Lee is now married to William Dawson, Esq. I hereby confirm the above codicil in favour of Eleanor Lee, now Dawson.’
After the death of the testatrix Ann Russell, her executors paid this legacy, given to Margaret Russell Clerk and her children, to the trustees William Dawson and Robert Clerk, by whom it was invested in the public stocks of Great Britain, in the name of Dawson and Clerk, for the purposes of the trust. After which Robert Clerk died, and Dawson became the sole surviving trustee. Some time in the year 1816, Dawson removed to the United States, and became a resident of Maryland. After which Margaret Russell Clerk, whose surname, with that of her husband and children, had been changed, by an act of the general assembly of Maryland, to Clerklee, (f) became very anxious to have the legacy given to her and her children transferred from the British funds to this country, and invested in some stock here; where, as she believed, it would be equally safe, and much more productive and convenient. Under that impression, she wrote a letter, without date, marked as the defendant’s exhibit G, to William Dawson, which letter it may be inferred from one written by her which bears date on the 15th of September, 1817, and from another written by William Dawson to James Clerklee, on the 9th of July, 1818, was written some time about the close of the year 1817. In this letter, without date, after explaining her motives for having the legacy transferred to and invested in this country, she says, £I therefore, with my daughters Ann, who is of age, Eleanor, Caroline, and Elizabeth, who are of an age capable of judging what is for their advantage, all having an interest in this legacy, unite, by their signatures, in this my request, as does Mr. Clerklee, in behalf of our two youngest children; and we therefore sincerely hope you will no longer delay complying with our request.’
What were the exact ages of Eleanor, Caroline and Elizabeth when they signed this letter does not appear; but it is stated in the bill, and admitted by the answer of Elizabeth, that she was, on the 15th of November, 1824, when the bill was filed, then a *273 minor; and. consequently, Elizabeth could not then have attained the sixteenth year of her age. Hence, when Margaret Russell Clerklee said, that £Eleanor, Caroline and Elizabeth were of an age capable of judging what was for their advantage/ she could have had no reference to the legal age of sixteen, when the law gives to a female a capacity to receive her estate; (g) or indeed to any thing more than her opinion of the then natural capacity of her children. It is proved, that Margaret Russell Clerklee, and James Clerklee signed this letter; but there is no proof of the other signatures.
After the receipt of this letter, the trustee William Dawson, in a letter, dated on the 9th of July, 1818, and addressed to James Clerklee, the husband and parent of these legatees, says, £I have much pleasure in stating to you, Mr. J. Clerk has consented to the legacy being transferred to this country; and further, what probably you have not much idea of, that by the advance in price in the funds, and some interest, since the death of Major Clerk, the amount paid to my bankers is ¿£2,406 14s. 2d. sterling.’ This surviving trustee Dawson, thus distinctly states, that he had sold the public stocks of Great Britain in which this legacy of £1,500 had been invested; and the sum which he had received for it.
It is stated and admitted, that James Clerklee and his wife Margaret Russell Clerklee are both dead; and it is admitted, that at the time of her death she left six children; Ann Russell Contee, the wife of Philip A. L. Contee, Eleanor Contee, the wife of Edmund H. Contee, Caroline Ashton Hawkins, the wife of Josias Hawkins, Elizabeth Clerklee, now of full age, and Margaret Clerklee, and Sarah Emily Clerklee, who are as yet unmarried infants. And further, that the trustee William Dawson is dead, and that the defendant Eleanor Dawson is his executrix.
The defendant Eleanor Dawson insists, that by an express provision of the will of the late Ann Russell, the matter in controversy should have been submitted to arbitration; and that no suit can be sustained by these plaintiffs at all, or at least not until they have shewn an attempt, on their part, to obtain a decision in that way. And this defendant further urges, that all the parties who have an interest in this matter, and who ought to be here, have not been brought before the court. These preliminary objections must *274 be examined and removed before we can proceed to consider the merits of the case.
That clause of the will of Ann Russell which, it has been urged, requires, that this matter should have been submitted to arbitration before this suit was instituted is expressed in these words :
‘And my will is, and I do hereby expressly declare and direct, that if at any time or times, after my death, any dispute, doubt or question whatever shall arise touching this my will, or the construction, or true meaning thereof, or of any part or parts thereof; then and in such case, and from time to time so often as any such dispute, doubt or question shall arise, the same shall be referred to and settled and determined by the said Hugh Inglis, and Edmund Antrobus, or the survivor of them, or the executors, or administrators of such survivor, whose award, settlement and determination in the premises or respecting the matter or matters in dispute, shall be binding and conclusive to and upon all parties concerned therein, or in any wise interested under this my will. And I do hereby further direct and declare, that if the person or persons concerned in any such dispute, doubt, or question as aforesaid, or any of them shall neglect or refuse to submit to or abide by and comply with the award, settlement, or determination to be made thereon, or respecting the same by the said Hugh Inglis and Edmund Antrobus, or the survivor of them, or his executors or administrators as aforesaid; or if any person or persons entitled, or who shall or may become entitled to any legacy or legacies, sum or sums of money, or other benefit, interest or advantage whatsoever under, or by virtue of this my will, or any of the devises, bequests or trusts herein before contained shall, at any time or times, after my death, dispute or contest the validity of, or in any wise attempt, or endeavour to avoid, defeat, set aside or litigate this my will, or any part or parts thereof; or shall bring, commence, or institute any action or other proceeding against the said Hugh Inglis and Edmund Antrobus, or either of them, their, or either of their executors or administrators, in any court or courts of law or equity, or in any ecclesiastical or other court or courts whatsoever, either touching or concerning the executorship of this my will, or touching or concerning any other act, transaction, matter, or thing in any wise relating to my estates or affairs, or the conduct, management, application or accounts thereof. Then and in any of the cases above mentioned ; and from and immediately after any of them shall happen the person or persons so refusing *275 or neglecting to submit to, or abide by and comply with such award, settlement or determination, to be made by the said Hugh Inglis and Edmund Jlntrobus, or the survivor or them, or the executors and administrators of such survivor as aforesaid; and the person or persons so disputing or contesting the validity, or attempting or endeavoring to avoid, defeat or set aside, or litigate this my will, or part or parts thereof, or so bringing, commencing, or instituting any action, suit, or other proceedings against the said Hugh Inglis and Edmund Jlntrobus, or either of them, their, or either of their executors or administrators as aforesaid, shall cease to have, take, derive, or be entitled to; and shall be from thenceforth absolutely barred, prevented, and excluded from having, taking, deriving, or being entitled to any legacy, sum of money, or other benefit, interest or advantage whatever under or by virtue of this my will, or any of the devises, bequests or trusts herein contained. And when any of the cases above mentioned shall happen, and from time to time so often as any of them shall happen, I give and bequeath the legacy or legacies, sum or sums of money, and all other the benefits, interests and advantages w’hich the person or persons acting contrary to the directions or declarations last herein before contained would otherwise have been entitled under this my will, or the devises, bequests, or trusts aforesaid, unto the said Hugh Inglis and Edmund Jlntrobus’ executors, administrators and assigns for their own absolute use and benefit.’
The position taken upon this provision of this will is one which has been repeatedly considered as well with regard to contracts as to last wills. It is not unfrequent in contracts, particularly in articles of co-partnership, to insert a covenant, that in case of any dispute arising between the parties, they shall forbear to sue, and refer the matter to arbitration. There can be no doubt, that if in pursuance of such a stipulation, any matter of controversy is submitted to arbitrators, and an award is made, it will be binding and a complete bar to any suit which either party may bring for the same cause of action. (h) But the award must be in all respects fair and unimpeachable; and for the purpose of ascertaining whether it is so or not, it may be reviewed and examined as in all other similar cases in a court of equity, (i) It is however an established rule, as well at law as in equity, that no mere agreement to refer any con *276 troversy to arbitration will oust the proper courts of justice of their jurisdiction in the case, (j)
A covenant never to sue for an existing demand, like a release of all suits, to avoid circuity of action, is construed to be an entire release of the demand itself; since the being divested of all power to enforce a right in a court of justice, where alone rights can be enforced, is, in effect, the being stripped of all right whatever. (k) An agreement to forbear to sue, under a certain penalty, until an arbitration has been had may give the party injured a right to recover the penalty. But as a court of equity cannot decree a specific performance of a contract for the reference of a dispute to arbitration, the parties must be allowed to bring their case before the proper tribunals of the country; and this will appear to be the more necessary when the imbecile and improvident nature of the domestic forum is considered. (l)
Arbitrators, according to the English law, have no power to enforce the attendance of witnesses, or to administer an oath to those who do attend; they can only decide upon the admissions of the parties, or on such testimony as may be voluntarily offered to them, (m) But under our act of assembly, (n) cand the approved custom of the court,’ as it is called, the courts of law in their rule, referring a case then depending, have given power to the referees to examine evidences on oath by the consent of both parties, (o) And here, as in England, this court has always been in the habit of entering decrees upon and enforcing awards by virtue of its own orders in cases then depending, (p) There are, however, cases in which a *277 Court of Chancery, from the difficulty it finds in dealing with the subject in dispute without great loss or total ruin, has earnestly recommended and insisted upon the parties, submitting the matter in controversy to arbitration, according to the terms of their previous express agreement. (q)
As in contracts, an absolute unqualified covenant not to sue for the recovery of an existing demand, amounts to a release of the *278 demand itself; so in a will, a positive and unlimited prohibition to sue, would, if enforced, in most cases, operate as a total revocation, or abnegation of the devise itself; and it would be a contradiction in terms and idle, to make a donation, and in the same breath to withhold from the donee all legal means of sustaining his right to the subject bestowed upon him. Hence, where a testator, by his last will, declares, that any legatee who controverts the disposition he has made of his estate shall, by so doing, forfeit his legacy ; such provision is held to be in terrorim only; and that no such forfeiture can be incurred by contesting any disputable matter, in relation to it, in a court of justice, (r)
By the law of Virginia, real estate may be devised by a holographic will, without any attestation whatever, (s) Under which law, our late great leader George Washington, wrote his will altogether in his own hand writing, without having it attested by any witnesses, by which he devised lands lying in the states of Virginia, Maryland, Pennsylvania, New York, and Kentucky, and in the territory north-west of the Ohio; and concluded by directing, that should any dispute arise, the matter should be decided by arbitrators to be chosen by the disputants; but without declaring, that the party who refused to submit to an arbitration should forfeit his right, or that the devised estate should go over to another, (t) This holographic will, although valid in Virginia, it is clear, was a nullity as to the real estate in Maryland, because of its not having been attested by three witnesses. Disputes did arise as to this or some other defect or ambiguity of this will; and yet it is understood to have been the opinion of the profession, that this provision directing a reference to arbitrators, did not prevent any party from instituting a suit to establish and recover his right. But the differences among the devisees and legatees were amicably adjusted without bringing suit.
It is said, that where the bringing of a suit by the legatee is prohibited with a bequest over, as in this instance, that then the consequence of bringing suit will be a forfeiture of the legacy. "Where a testator devised his estate to trustees to be sold or disposed of for the payment of his debts, and to make provision for his *279 younger children; and then gave a legacy of £40 to his heir, upon condition, that he did not disturb the trustees. Upon a bill filed, by the trustees, to have an execution of the trust, it was held, that the heir must either join in the sale, or lose his legacy. (u) This case has been sometimes cited to shew, that where there is a bequest over the legacy will be forfeited, if the legatee institutes a suit; but it evidently has no direct bearing upon that question. It merely shews, that where a legacy is given to one upon condition, that he aids in, or does not counteract the execution of the testator’s will, the legacy cannot be recovered unless the condition be complied with. It establishes the position, that where a bequest is made for a valuable consideration, if the consideration be withheld, the legacy falls. The case has this extent and no more.
There may, however, be some cases which do, apparently, support the position as a general rule. But the decision, in a leading case, usually cited for this purpose, rests upon other and better principles than those by which the rule as to a devise over, is said to be sustained. The case was this: A freeman of London had several children, all of whom he advanced in marriage in his lifetime ; after which, by his will, he gave to one of his daughters £35, taking notice, that he had advanced her; provided, that if she, or her husband, should refuse to give a release to his executors, or should any ways trouble or disturb them, upon any claim or pretence by virtue of the custom of London, that the legacy of £35 given to her, should go over to the child of his youngest deceased daughter. After the testator’s death, this legatee brought suit to recover her portion according to the custom of London; and it was proved, that she had been advanced, as noticed in her father’s will. Upon which it was held, that she was barred of her customary part, as having been fully advanced; and likewise, that she and her husband had forfeited the £35 legacy by her claiming her orphanage part, and by reason of the devise over. (w)
It is evident, from this condensed view of the case, that the attempt to recover a child’s portion, which had been actually advanced and paid, was a corrupt effort to obtain what was not due, to the prejudice of the other children; and was such an iniquitous movement as required to be repelled, and deserved to be punished. Therefore, the forfeiture was justly imposed as an award due to detected fraud; and because of the legatee’s claiming the orphan *280 age part, and by reason of the devise over. By which the testator manifested his intention to impose a penalty upon such a fraudulent attempt; and not because of the other and the quaint conceit assigned as a reason, that when the legacy was once vested in the devisee over, equity could not fetch it back again. For the mixture of good and ill together makes the whole bad; the truth is obscured by the falsehood; the virtue drowned by the vice. And there are many instances both at law and in equity, where the whole of a just claim may be lost, because of a fraud against others, or the playing of a trick to come at it. (x)
Considering this decision as resting upon this ground, that the testator and the court imposed and enforced the forfeiture to prevent and punish a fraudulent attempt to obtain a double or unjust proportion of an estate, it will be found to accord in principle with a legal provision which has received, for a length of time, the reiterated approbation of the general assembly of this state; besides having had, in other countries, for ages past, the sanction of a very large and enlightened portion of mankind. By a provision of one of the annual insolvent laws, (y) which has been often re-enacted, and is now the standing law of the state, it is declared, that if a creditor, to whom a real debt is due, shall collude with the debtor to gain an undue preference, or for concealment of any part of the debtor’s estate, or shall concert any acknowledgment of the debtor, or any kind of security, to give false colour to his claim for more than is bona fide due, such creditor, shall lose his debt truly due; (z) evidently, as a punishment for his fraudulent and corrupt attempt to prejudice or cheat others. A similar legal provision forms a part of the code of England, Scotland, France, Spain, and Hindostán. (a)
Taking this view of the subject, it is clear, that a mere devise over will not, in all cases, cause the forfeiture to be enforced on a suit’s being brought; but, it must clearly appear, from the nature of the case, that the institution of the suit can only be considered as the commencement or partial execution of a corrupt and fraudulent design to injure others, or those to whom, in such an event, the legacy is given over. For it would be a strange inconsistency *281 to impute to any testator, that he intended to expose the object of his bounty to be disappointed by accident or caprice; or that he should seriously have intended to prohibit him from asking the aid of a court of justice to obtain that which he had actually given him.
In this case I find it impossible to believe, that Ann Russell really intended to declare, that any one of her descendants, about whom she has manifested so much impartial solicitude, should forfeit. her legacy by claiming it in any form of suit; and that it should, in such case, vest in persons toward whom she entertained no such specially kind and maternal feelings; and who too, by being nominated as the executors, arbitrators, and legatees over, were so deeply interested, and had it so much in their power to provoke a suit so as to produce a forfeiture. I therefore hold, that this clause of this will, requiring all disputes to be submitted to arbitration, is to be regarded in no other light than as a strong admonition or threat intended to preserve harmony among the various objects of her bounty.
But, apart from these considerations, this clause can have no direct bearing upon the present controversy. This is not a suit against the executors of the late Ann Russell, or one in which the validity and operation of the will is questioned in any way whatever; on the contrary, it is founded upon an admission of the will in all respects, and claims the fulfilment of its provisions of the trustee to whom, and to a suit of this nature, requiring disputed matters to be referred to the nominated arbitrators, cannot have been intended to apply; because the testatrix has distinctly contemplated the responsibility of the trustees Dawson and Clerk, according to a regular judicial proceeding, by her express declaration, that they should only be answerable for gross negligence; and it is the alleged negligence and mismanagement of the surviving trustee which is the cause of this suit, not any dispute about the will.
I therefore conceive, that there is no foundation for this first objection, and that this suit may well be sustained notwithstanding this clause requiring certain matters therein specified to be referred to arbitration in case of any dispute.
The next preliminary objection is as to the want of parties. It is urged, that Ann Russell Contee, the wife of the defendant Philip A. L. Contee, had a direct interest in this matter; and that her legal representatives, the bill stating her to be dead, ought to have been made parties. If the interest of Ann R. Contee in this *282 legacy became vested as it did by her attaining her full age, or by her marriage before or after the death of her mother, it was a chose in action belonging to Ann R. Contee; and as all personal things are under the power of the husband, he may either release or forfeit them; (b) it is, therefore, upon that ground sufficient, that the husband alone as defendant has appeared, and by his answer admitted, that this claim, to which he had so become entitled in right of his wife, had been satisfied.
But it is objected, on behalf of the defendant Eleanor Dawson, that the. answer of the defendant Philip A. L. Contee has not been sworn to in the manner required by the course of the court; and therefore cannot be considered as an answer for any purpose; and is certainly not such an answer as will bind him and his wife so as to justify Eleanor Dawson, as executrix of the trustee, in distributing the assets in payment of the proportions to which the other legatees are entitled; since she has not assets sufficient to satisfy all. This objection involves two inquiries; first, whether the answer of the defendant Philip A. L. Contee is such an one as must be received as effectual so far as it can operate for or against his co-defendants; and secondly, whether Eleanor Dawson has in truth alleged and shewn a deficiency of assets.
The first section of the fourth article of the constitution of the United States delegates to congress the power to prescribe the manner in which the public acts, the records, and the judicial proceedings of each state may be proved in every other state, and the effect thereof. And congress have passed several acts in execution of this power. But those laws of the federal government cannot be allowed to regulate the matter now under consideration; because, an answer to a bill filed in this court, or indeed any other portion of its proceedings, wherever it may be authenticated, or wherever the person may reside from whom it may be derived, must be deemed to all intents and purposes a record or judicial proceeding of this state only, and not of any other state. It is, therefore, perfectly obvious, that this federal law can have no direct and positive application to the mode of authenticating answers, or any other part of the judicial proceedings of this court, (c)
It is quite common for the courts of one nation to seek the aid of the magistrates of foreign countries; and to ask to be allowed to collect testimony, and obtain from them and under their autho *283 rity the means of administering justice at home. The acts, testimonials, and documents thus drawn from abroad, are accepted as a courtesy from the foreign nation, and accredited, not upon the ground of their having any force or operation in the country from which they are derived, (d) but because of the value set upon them by the tribunal before which they are used. They are nothing where taken; but duly and properly appreciated here where they are allowed to be, to a certain extent, available, (e)
Considering the great intercourse between the several states of our Union, it is obvious, that in many cases it would be difficult to do justice unless the courts of the several states should lend their aid to each other in matters, from any jurisdiction over which, all other judicial power was excluded, (f) It seems that some of the English courts have held, that no difference in point of reason or law, exists between affidavits made in Ireland and Scotland, and those made abroad; (g) but others of the English tribunals have entertained a higher respect for such acts coming from the sister kingdoms of Scotland and Ireland, than from foreign nations, (h)
In accordance with the principles of these last mentioned English authorities, I feel disposed to go forward with the spirit of the federal constitution, and to' allow all such ancillary testimonials, derived from any sister state or territory of our Union, to be used in a course of judicial proceeding without strictly exacting all those solemnities and forms of authentication usually required for the admission of similar testimony from an entirely foreign nation. It is not saying too much to aver, that all the public functionaries, of *284 each state of our perpetually intermingling confederacy, know more of the forms and modes of proceeding of the officers and mágistrates of every other state than of any foreign nation whatever. And besides, the harmonies of our peculiar system of government seem to require, that the magistrates and tribunals of each state should extend the practice of comity and credit toward those of every other state, as far as safety to the rights of persons and property will permit, and that may be to a considerable extent; for although, in such cases, there can be no prosecution for perjury against any one here, who has, abroad, testified on oath, or made affidavit to the truth of a fact, which can be shewn to be false, yet the parties may be punished for practising an imposition upon the court, (i)
This court has, in fact, acted upon the distinction between testimonials from other states of our Union and those from foreign nations for many years past. Prior to the revolution, certainly as late as the year 1761, it was the practice here, in accordance with the English mode of proceeding, to send a didimus potestatim, even to a neighbouring colony, to take the answer of a defendant resident there, (j) But soon after the revolution a didimus potestatim, seems to have been dispensed with, and answers from other states of our confederacy by being sworn to before a mayor or other principal magistrate of a city, or a justice of the peace, on its being certified under the seal of the proper officer, that the person who administered the oath or affirmation was then in truth the officer he professed to be; (k) as where an answer had been sworn to before a justice of the peace of the District of Columbia; and it was certified, in the usual form, by the clerk of the county, that he was duly commissioned at that time, the answer was received. (l)
But in the case under consideration, the affidavit of the truth of the answer of the defendant Philip A. L. Contee, purports to have been made before a justice of the peace of Westmoreland county, *285 in the state of Virginia, without any further authentication whatever. This, if allowed, would place the simple attestation of every justice of the peace, over the whole Union, upon a footing with that of such officers of this state. I do not think it would be safe to extend our comity so far. A reasonable and just degree of caution demands, that some solemn additional public testimonial should be required to shew, that the judicial officer or magistrate before whom such an affidavit has been made was, in truth, the public functionary he states himself to be. I am, therefore, of opinion, that the authentication of this paper is not such as to entitle it, on that ground, to be received as the answer of the defendant Philip A. L. Contee.
But the plaintiffs have expressly consented to receive this as the answer on oath of Philip A. L. Contee, without any further or other authentication; and that they may so receive it, is warranted by every day’s practice of this court, as well as by many authorities to be found in the English books to the same effect, (m) If, on its being so received by the plaintiff, it will bind the respondent as effectually as if made upon oath, I can see no reason why it should not be equally as binding upon any co-defendant so far as his interest may be affected by the answer of such defendant on oath; since such co-defendant could not except to it because of its not having been sworn to, or because of its insufficiency, or for any other cause. I am, therefore, of opinion, no fraud being shewn or even intimated, that this must be regarded as the answer of Philip A. L. Contee, to all intents and purposes whatever.
The next inquiry is, whether Eleanor Dawson has alleged, or shewn a deficiency of assets. In her answer she says, ‘that she has not yet been able to settle up the estate of the said testator, and that there are considerable debts now due to the same which are still unpaid ; and the assets now in her possession are insufficient to discharge the debts due by the testator.’
It is a rule, universally admitted, that the allegata and probata, must substantially correspond. A party cannot, in any case, be allowed to avail himself of proof of any matter, which he has not alleged; nor can the opposite party be called on to sustain a position not asserted ; or to establish a fact which, by the course and terms of the pleadings, has been admitted to be true. An allega *286 tion of insufficiency of assets is tantamount to an assertion, that the estate of the deceased is insolvent. It is a matter presumed to be within the .knowledge of the executor; and if he does not expressly and distinctly assert the fact of insufficiency, he virtually admits a sufficiency of assets, at least to satisfy the demand then made of him. It is impossible to consider the allegation in this answer as an assertion, that the estate of the late William Dawson is insolvent and insufficient to pay all his debts. The allegation, ‘that the assets now in her possession are insufficient,’ is unequivocal; the certainty of assets accruing, is distinctly referred to; and it is evident, from the general complexion of the answer, that the respondent could not with a safe conscience hazard the assertion, that the estate of her testator was insolvent. She has not, therefore, alleged, that there was not a sufficiency of assets to satisfy the claims made by this suit, (n)
But admitting such an averment to have been made, it has not been sustained by proof. The insufficiency of assets turns altogether upon the admission of the claim of James Dawson, as a valid and subsisting debt. The proof is, that the witness some time prior to the year 1816, when WilUam Dawson came to this country, saw that he had charged himself on his books of accounts, with a bond given to James Dawson, his son, to secure the payment of the sum of $16,000, after his, William Dawson's death; and that the witness heard, in the family, and from his mother, the defendant Eleanor Dawson, before the institution of this suit, that James Dawson had such a claim against the now late William Dawson, and that a small part of it had been paid; and, yet it was not until after Eleanor Dawson, as he says, had been informed of the claim in this case, and another claim against the estate of her testator, that she was induced to obtain leave to reform her account with the Orphans Court, for the purpose of introducing into it, then for the first time, this claim of James Dawson. But failing in the attempt to have this claim allowed by that court; and after she had heard that James Dawson had left England for India, she herself caused a suit to be instituted in his name against herself; and, on the 2d of June, 1826, confessed a judgment for the sum of $19,834 35, with interest from the 31st of December, 1818, and *287 costs to be levied on tbe assets in hand, or as they should accrue in a due course of administration.
Taking all the proof together then, including this solemn formulary of a judgment, and the authenticity of this alleged claim of James Dawson, rests upon mere hearsay, and a great portion of that hearsay derived from the defendant Eleanor Dawson herself. There is no direct competent proof, that James Dawson ever, by himself, or his attorney, or agent, asserted, that he had such a claim against the estate of his father. And it is even left somewhat doubtful, from what is said of his being in a remote region of the earth, whether he was actually alive when this judgment was got up on his behalf. The question whether any debt was due, and to what extent, has never been tried with that searching attention which these plaintiffs had a right to expect from this executrix, (o) It is true, that an executor is allowed to pay any creditor of his testator; and is not bound to contest the claim; but, under colour of satisfying a creditor, he cannot he permitted to retain without control, or to give away the assets of his testator, (p)
In short, looking to all the circumstances, in relation to this debt, said to be due to James Dawson, I cannot consider it to be such a claim as ought to be allowed to diminish or exhaust the assets of the testator William Dawson, to the prejudice of these legatees, who also stand here upon the strong ground of being his creditors. Laying aside this claim of James Dawson, there is certainly no allegation or proof of any deficiency of assets; and consequently the argument, that all these legatees, children of Margaret Russell Clerklee, must be parties to this suit to receive now their respective proportions of the assets; because of there not being enough to pay all, must entirely fail, and there is an end to all objections on that ground.
Advancing now to the consideration of the merits of this controversy, after having cleared away the preliminary objections, the first inquiry which presents itself is as to the nature of the interest which has been given in this legacy to the children of the late Margaret Russell Clerklee.
It is very clear, that no other interest vested in the mother, than the right to receive the annual fruits or dividends during her life; and after her death, which has happened, the whole principal and interest or dividends passed to her children. She left six daugh *288 ters and no son. Three of her daughters have been married; one has since attained the age of twenty-one years; and two are yet unmarried infants. By the terms of the will of Ann Russell, a right to a share of this legacy could only vest in any of these daughters on the occurrence of one of four circumstances in addition to that of her having survived her mother; first, she must then have attained the age of twenty-one years; or secondly, she must have been then married; or thirdly, she must after the death of her mother have been married; or fourthly, after that event she must have lived to attain the age of twenty-one years. Upon the happening of any of these circumstances an interest in a due proportion of this legacy vested in each daughter so qualified, as a tenant in common, with her other sisters, who should, in like manner, then be or thereafter become entitled to a share.
The legacy is directed to be equally divided among all, if all should become so qualified to take. Hence, on the death of the mother, leaving six daughters, it became liable, upon the happening of the specified contingencies, to be divided into six equal parts; each one of which could only vest as each daughter, who then was, or thereafter became qualified to take. But as, upon the death of any one of the six daughters before she becomes entitled to take, her share would fall in for the benefit of the rest; or in other words, the whole legacy would not, in such case, be divided into so many as six parts; the number of shares into which it must ultimately be divided cannot be finally determined until it shall have been ascertained, whether or not any have died without having been qualified to take, after the youngest of them shall have been married, or shall have attained the age of twenty-one years. Before the institution of this suit, on or after the death of the mother, three parts of this legacy became vested in those of her daughters who were then or thereafter of full age or married; and one other part, after the filing of this bill, became vested in the defendant Elizabeth Clerklee, who attained her full age. And, consequently, the two remaining parts must await the event of the marriage, or coming of age of the two now unmarried infant daughters; until the happening of one or the other of which contingencies, or the death of either or both of those infants previous thereto, they first, and next their sisters, have an expectant interest in those two parts of this legacy, to meet the happening of which event the amount of those shares must be still retained in trust.
But it has been contended, that this legacy has been transferred *289 to this country, and lost without the default of the trustee; and therefore, that these plaintiffs cannot recover any thing, or certainly no more than a proportion of what has been saved, and is now in the hands of his executrix the defendant Eleanor Dawson; since it has been expressly declared by the testatrix Ann Russell, that ‘they, the trustees, shall not be answerable or accountable for any misfortune, loss, or damage whatever, that may happen to the said trust moneys, or premises, or any part or parts thereof, unless the same shall happen by or through their or his gross and wilful neglect or default respectively.’
It is distinctly shewn by the codicil to this will, and so admitted, that the testatrix Ann Russell made her will with a full knowledge of the situation and legal capacities of all her legatees. She designates these legatees as the children of her grandaughter Margaret R. Clerk, wife of James Clerk, of Maryland; and with this full knowledge of all circumstances; the testatrix gave this legacy, and directed the trustee ‘to invest the same in their or his names or name in the public stocks or funds, or at interest upon parliamentary, government, or real securities.’
This specific direction as to the disposition to be made of this legacy, it is evident, was given with a view, that it might be, without delay, made productive, and placed in the greatest possible security, to await the remote events which it was declared should happen before it should be wholly paid over. The trustees were allowed a very limited range of discretion as to the species of investment in England, and no where else. And it manifestly appears to have been the intention of the testatrix, that when the investment had once been made it should remain, without exposing the legacy to any new risk by any change whatever; or if any unforeseen circumstance should render a new investment necessary, that it should be made in some one or other of the specified English securities; and certainly not in any foreign funds, stocks, or securities whatever. (q)
Hence, I feel perfectly satisfied, that the sale made by the surviving trustee William Dawson, of the stocks in which this legacy had been invested, and the transfer of the proceeds from England to Maryland was a most palpable and gross violation of the trust reposed in him; and that he must be held strictly accountable for *290 all the consequences thereof; unless he, or at this time, his executrix, can shew that he was induced to make the sale and transfer by the cestui que trusts, who were then competent to recommend and to sanction the transaction.
The interest of the cestui que trust, Margaret R. Clerklee, extended only to the profits and dividends of the invested legacy during her life, to dispose of as a feme sole ; and therefore, as it has been proved, that she advised and required the change to he made, she might have been bound to submit to any loss sustained by reason of the transfer. But the consent of her children to the sale, which has been so much relied on, was given, if at all, during her life-time; and consequently, before any interest whatever had vested in them. The direction of the legacy toward them was, at that time, a mere possibility; they might, none of them, have survived their mother; and if they had, still they might, all of them, have died before they became entitled to take; in which case the legacy went over to John Clerk. The children of Margaret R. Clerklee during her life, were then the mere apparent, but by no means the actual cestui que trusts of this legacy. And having nothing more than a possibility or expectancy, without even the shadow of an absolutely vested interest, they had nothing to release, nor any estate which they could require or authorize the trustee to dispose of or transfer. And therefore, even supposing the proofs had established the fact, that they had each one, being competent to contract, required the transfer to be made; yet as it was made before any right whatever had accrued to them, it could not be deemed a sound and available sanction of the conduct of this trustee.. For the relinquishment of a mere expectancy, as the release of an heir apparent during the life of the ancestor is absolutely void, (r)
If, however, these daughters had been sole and nearly of full age, and had by misrepresentation, concealment, or any fraudulent means induced the trustee to make this transfer; and the trustee had made it under a confident and honest, hut' erroneous reliance on their assurances, he certainly could not now be made to bear any loss which ensued in consequence thereof, (s) But the defendant Philip A. L. Contee admits, that the claim to a share of this legacy which had devolved upon him, in right of his wife, has been satisfied; and there is no proof whatever, that any of the *291 other children of the late Margaret R. Clerklee ever, in any form, requested or approved of the transfer made by the trustee William, Dawson; or that they were then of an age to mislead him in the execution of his trust, or to practise a fraud upon him in any way whatever. I am therefore of opinion, that the sale of the English stocks, in which this legacy had been vested, as regards all these daughters, except Ann Russell Contee, never was required to be made, and has not been sanctioned, in any manner whatever, by these cestui que trusts; and that the trustee must be held liable for all the consequences of that unwarrantable act-
Hence, supposing it to have been proved, that the proceeds of the English stocks in which this legacy had been invested, had been brought to Maryland, and, in great part, invested in the stock of the City Bank of Baltimore, and lost by the insolvency of that institution; and other parts loaned on a mortgage of real estate, as is alleged, still the trustee Dawson, and his executrix the defendant Eleanor Dawson, must be held liable. But there is, in fact, no satisfactory proof, that any part of the proceeds of the sale of the English stocks were actually invested in the stock of the City-Bank of Baltimore.
The defendant Eleanor Dawson has attempted to take shelter under another defence. Ann Russell, by the codicil to her will, has declared, in effect, as it is said, that if Margaret R. Clerklee contests Eleanor Dawson’s right to a share of certain estates, that then this legacy shall go to Eleanor Dawson. Upon which it is urged, that it has not been shewn, that Eleanor Dawson has received her share of the estates referred to in the codicil.
But I am of opinion, that it was the intention and meaning of this testatrix by that codicil merely to declare, that Eleanor Dawson should not be hindered, obstructed, or impeded in obtaining the benefit of the estates referred to, by any positive or active interference of the legatee Margaret R. Clerklee ; and not that Margaret R. Clerklee should actually aid and assist Eleanor Dawson in obtaining her rights, and see that she received her full share of those estates. And consequently, that it lays upon the defendant Eleanor Dawson to prove, that her right has, in fact, been con- ' tested; and that she has been hindered and prevented by Margaret R. Clerklee from obtaining her full share of the estates spoken of in the codicil. So far, however, from there being any proof of that kind, the testimony is full and conclusive, to the extent it goes, that she has met with no impediments whatever; but on the *292 contrary, has had every assistance, that could be given, or was necessary ; and has, in fact, recovered her full share of those estates wherever it appears she had required or demanded it. There is then not the least foundation, in point of fact, for this defence resting upon the conditional bequest over to Eleanor Dawson.
The defendant Elizabeth Clerklee, having attained her full age, is now in a situation to demand and receive that proportion of this legacy which has vested in her. By her answer she avers, that she has nothing to do with this bill as a defendant; and prays that it may be dismissed, and such other benefit afforded her as may seem meet. All persons having the same interest, should stand on the same side in the suit; but if any one, identified in interest with the plaintiff, refuses to appear as a plaintiff, he may be made a defendant, by stating in the bill that he refused to concur as plaintiff, or by stating the nature of his interest, as in this instance, (t) For it is well settled, that the court not only may, but must as a duty, decree between co-defendants, where the matter comes fully before it, and a case is fully made out between them; so that the whole controversy may be finally and at once closed. (u) Therefore the defendant Eleanor Dawson will, in addition to the shares of this legacy due to the plaintiffs, be directed to pay this share now due to her co-defendant Elizabeth Clerklee.
It now sufficiently appears, that of the six children of the late Margaret R. Clerklee, four have been entitled, according to the terms of the bequest, to take the whole of this legacy in case the two, who are now infants, should die under age and before they have been married; and consequently as to those two-sixth parts of this legacy it is now ascertained, they must certainly go to the two infants, on their becoming qualified to take; or equally among the four in whom the interest in the legacy has already vested. And therefore these children have now such a contingent interest in the preservation of those two shares as entitles them to ask the aid of this court in having them placed in a state of security until the happening of those events which are to determine to whom they are to be paid.
As between these plaintiffs and the defendant Eleanor Dawson, and also between her and her co-defendants, the children of the *293 late Margaret R. Clerklee, the whole case as to the right to the two-sixths of this legacy, as well as regards the great peril in which they now stand, considering the misconduct of the late trustee William Dawson ; and the sinking condition of his estate has been fully made out by the pleadings and proofs3 and therefore, I conceive it to be my duty to have those two shares brought into court and invested in some secure and productive form for the benefit of those of these children of Margaret R. Clerklee, who may eventually become entitled to them.
As to the nomination of a trustee to make such investment, and the kind of security in which it shall be made, I shall expect to have the suggestions of the parties when the auditor shall have made a report as directed.
The late trustee William Dawson, in his life-time, distinctly admitted, that the proceeds of the sale he had made of the stock in which this legacy had been invested, and some interest since the death of Robert Clerk, his co-trustee, as before mentioned, (the amount of which interest to be now ascertained by proofs to be laid before the auditor,) amounted to the sum of ¿62,406 14s. 2d. sterling. And therefore, this defendant Eleanor Dawson, his executrix, must be charged with the principal of that amount for the benefit of these legatees. One-sixth part of that amount has vested in each one of the daughters of Margaret R. Clerklee who is now of full age or has been married. And consequently, from the time the share so vested and became payable, the trustee, being in default, must be charged with interest thenceforward on the sum awarded to the claimant. And the trustee must be charged with interest on the whole sum from the death of Margaret R. Clerklee until a share vests; when a due proportion of the whole is to be awarded to the claimant with interest 3 and then the trustee charged with interest on the residue of the principal until the next share vests, when a proportion of the whole is to be awarded to the claimant with interest from that date, and so on until the whole legacy is disposed of. But as it is admitted, that the share which vested in Ann Russell Contee has been satisfied, the trustee must be credited for that as of the day of the death of Margaret Russell Clerklee.
It has not been distinctly shewn either in the pleadings or proofs when Margaret R. Clerklee died; nor when any of the daughters, who survived her, attained their full age or married. I shall therefore send the case to the auditor to state an account from the *294 pleadings and proofs in the case, and such other proof in relation to these points as the parties may lay before him.
In the event of the death of either or both of the now unmarried infant daughters before they become entitled to take, her or their share or shares will devolve upon the other sisters, if living, or, upon the legal representatives of those who may be then dead; on which event it may become necessary to bring the new parties and interests before the court by a supplemental bill, or some other correct course of proceeding.
Whereupon it is Ordered, that this case be and the same is hereby referred to the auditor, with directions to state an account accordingly from the pleadings and proofs now in the case, and such other proofs as the parties may lay before him. And each party is hereby allowed to take testimony in relation to the said matter of account before any justice of the peace; or before the commissioners in the city of Baltimore, on giving three days notice as usual. Provided that the said testimony be taken and filed in the chancery office on or before the fifteenth day of June next.
In obedience to this order the auditor made a report as of the 19th of September, 1829, in which he says, that he had examined the proceedings, and from them had stated an account A between the defendant Eleanor Dawson as executrix of William Dawson, deceased, and the children of Margaret R. Clerklee, deceased, in which the proceeds of sale of the stock, $9,202 94, which was originally purchased with the principal legacy bequeathed by Ann Russell, deceased, in trust for said children, as the said proceeds are ascertained by the deposition of Frederick Dawson, are apportioned agreeably to the said order.
From this account A, it appears, that there is due to the complainants Edmund H. Contee, and Eleanor Russell his wife, the sum of $2,636 38; with further interest on the sum of $1,713 79, part thereof, from this date until paid. To Josias Hawkins, and Caroline Ashton his wife, the sum of $2,741 23, with further interest on the sum of $1,993 14, part thereof, from this date until paid. To Elizabeth Clerklee, the sum of $2,803, with further interest on the sum of $2,037 63, part thereof, from this date until paid. To Margaret Clerklee, who has lately attained her full age, the sum of $2,836 24, with further interest on the sum of $2,594 91, part thereof, from this date until paid. And to Sarah Emily Clerklee, payable on her arrival at age or marriage, *295 a like sum of $2,836 24, with further interest on the sum of $2,594 91, part thereof, from this date until paid.
But the auditor is informed, that the admissibility of the deposition of the said Frederick Dawson, will be objected to on the part of the complainants. And he has, agreeably to instructions from the complainants’ solicitor, stated another account B, which is predicated upon the letter of the said William Dawson, deceased, in his life-time, to James Clerklee, dated on the 9th of July, 1818. In this letter the said William Dawson states the amount paid to his banker, for principal of said legacy, and some interest thereon. The sum paid for interest is nowhere stated, except in the exhibits accompanying the aforesaid excluded deposition. And as this omission is to be attributed to the laches of the defendant, the auditor has thought it proper to charge the whole of the aforesaid amount of $10,696 48, as received for principal of said legacy.
From the account B, it appears, that there is due to Edmund H. Contee, and Eleanor R. his wife, the sum of $3,064 24, with further interest on the sum of $1,991 92, part thereof, from this date until paid. To Josias Hawkins and Caroline A. his wife, the sum of $3,186 11, with further interest on the sum of §2,316 61, part thereof, from this date until paid. To Elizabeth Clerklee, the sum of $3,257 90, with further interest on the sum of $2,600 77, part thereof, from this date until paid. To Margaret Clerklee, the sum of $3,296 52, with further interest on the sum of $3,016 03, part thereof, from this date until paid. And to Sarah Emily Clerk-lee, payable on her arrival at age or marriage, the like sum of $3,296 52, with further interest on the sum of $3,016 03, part thereof, from this date until paid.
On the 16th of December, 1829, the plaintiffs filed the following exceptions to this report of the auditors first, because the account A, as stated and reported, is founded upon the deposition of Frederick Dawson, who is not a competent witness; second, if he be competent as a witness, that his deposition is in contradiction to other evidence in the cause, and to the acts and admissions of the late William Dawson, and ought not to have been relied on by the auditor; third, because the account B, as stated and reported by the auditor, is the true account between the parties.
And on the 22d of the same month, the defendant Eleanor Dawson filed the following exceptions to this report of the auditor; first, because the principal sum charged in each account, is greater *296 than the proof and proceedings in the cause warrant; second, because there is a charge of interest in. said account, whilst none is justified by the said proof and proceedings; or if any interest should be charged, because the same is charged at too great a rate; and because there is a charge of compound interest; third, because if liable to interest at all, it was only from the death of Mrs. Clerklee, which was on the 23d of November, 1818, and the same is calculated from the 15th of October, 1818; fourth, because no allowance is made for the expenses charged by thé bankers, in England, to the trustees of the legacy, and paid by them; fifth, because no allowance is made for the loss upon that portion of the legacy invested by William Dawson, in the stock of the City Bank of Baltimore; but his estate is charged with the whole sum so invested; sixth, because no credit is given for the amount of .the legacy loaned to Mrs. Clerklee; seventh, because said report and accounts are in many other particulars erroneous and not warranted by the proof and proceedings in the case.
26¿A January, 1830.
Bland, Chancellor.
This case standing ready for final hearing, and having been submitted, without argument, the proceedings were read and considered.
On reviewing the order of the 14th of April last, and consi-dering the proofs taken under it, as reported by the auditor with his statements, it appears, that a question has arisen, which was not at all contemplated by the reasoning and explanations with which the case was sent to the auditor.
The late trustee William Dawson, in his letter of the 9th of July, 1818, speaking of the sale of the British stocks, in which the legacy had been invested, says ‘that by the advance in the price of the funds, and some interest since the death of Major Clerk, the amount paid to my banker, is ¿62,406 14s. 2d. sterling.’ When this case was last under consideration, there was no proof by which the allusion of this expression, ‘and some interest, since the death of Major Clerk,’ eould be shewn to apply to any other than the dividends arising from the investment made by the trustees; and which, belonging to Margaret R. Clerklee, as tenant for life of the legacy, could not be awarded to those of her children who were parties to this suit. I therefore directed the amount of such interest to be ascertained by proof, to be laid before the auditor; and that the defendant Eleanor Dawson should be charged with the principal of the amount for which the British stock sold; intending thereby to exclude from the sum to be divided among these lega *297 tees in remainder all- interest or dividends received by the trustees from the investment, and to which Margaret R. Clerklee had become entitled.
But it now appears by an account between the late trustees and their agent, reported by the auditor as part of the proofs laid before him, that a large amount of interest on the legacy of ¿61,500 had accumulated in the hands of the executors of the testatrix Ann Russell, which had been paid by them, with the principal, to the trustees who had invested the whole accordingly as capital, after deducting the costs, and charges of the transaction. These additional facts give rise to the objection, that the interest, which accrued upon the legacy from the death of the testatrix to the time of the investment,, belonged exclusively to Margaret R. Clerk-lie the tenant for life; and, not being a part of the capital, directed to be invested, must be deducted from the amount which the late trustee William Dawson acknowledged he had received,
I conceive it to have been the intention of the testatrix to allow a. reasonable time to the trustees to make an investment of this legacy as. directed; and that all its accumulations in the hands of her executors, in the way of interest,, were to be considered as parcels of its principal', and to be invested, as such, by the trustees when paid to them. It is true, that where there has been any unreasonable delay in making such an investment, or the tenant for life would, by being postponed- until it was actually made, be materially injured, he has been allowed the accruing interest from the end of one year after the death; but here no such unforeseen or injurious- delay has been, alleged or shewn, (v) The testatrix gave to the late Margaret R. Clerklee during her life, only the dividends arising from the investment, not the interest on the sum of £1,500. There is a material distinction between the interest on money, and dividends on stock. Interest accumulates from day to day; but the dividends on stock are made payable on certain days like rent;. and therefore, on the death of the tenant for life, interest would be calculated up to the very day of the death; but of dividends there could be no such exact apportionment; the amount not actually payable at the time of the death of the tenant for life, would go to him in remainder. And therefore, in general, when the interest, dividends, or profits of stock are given to one for life, nothing *298 passes to the tenant for life but the ordinary and proper dividends of such stock, (w)
It is clear, from the proofs, now adduced, that the trustees themselves, with the knowledge and acquiescence of Margaret R. Clerklee, the tenant for life, considered those accumulations of the legacy, which they received from the executors, as a part of its capital; and actually invested them, as such, for the benefit of all, as well for the tenant for life, as for those in remainder; and that the late trustee William Dawson, by the expression, ‘some interest since the death of Major Clerk,’ had no allusion whatever to any dividends to which Margaret R. Clerklee, the tenant for life, was exclusively entitled; but to certain accumulations of interest which had been received from the executors, and which had been invested as a part of the capital of the legacy itself. And from the whole of the proofs, it is now clear, that Margaret R. Clerklee, the late tenant for life, must have received all the interest or dividends to which she was in any manner entitled; and that she had received from those trustees no dividends or interest which had not then come to their hands for her use, and which they ought now to be allowed to retain. And consequently, that the sum which the late trustee William Dawson, specifies as the amount of the proceeds ' of the sale of the stock is formed altogether of that in which the capital of the legacy itself had been regularly invested; and for the whole amount of which his representative, the defendant Eleanor Dawson, is chargeable.
It is objected, by one of the exceptions of the defendant Eleanor Dawson, that if she was liable for interest at all, it could ‘only be from the death of Margaret R. Clerklee, which happened on the 23d of November, 1818, and not on the 15th of October of that year. The only proof in relation to the time of the death of Margaret R. Clerklee, is that she died in the fall of the year 1818. The long established rule of the court, in this respect, is, that where it becomes necessary to determine the price or value of any thing, and the witnesses differ, to strike an average, and to take the mean as the true price or' value, or where, as in this instance, it becomes necessary to ascertain the exact date of an event, and it is only proved to have happened within a certain designated space of time, that the medium shall be assumed as the true date *299 when it happened. And consequently, the auditor was correct in this instance, in assuming the 15th of October, 1818, as the day of the death of Margaret R- Clerklee.
Whereupon it is Decreed, that the statement marked B, as made and reported by the auditor, be and the same is hereby ratified and confirmed; and that all other parts of the report of the auditor, with the exceptions of the parties thereto, which are in any manner at variance with the said statement marked B, are hereby rejected and overruled.
And it is further Decreed, that the defendant Eleanor Dawson, pay or bring into this court to be paid unto the said Edmund H. Contee, and Eleanor R. Contee his wife, the sum of $3,064 24, with interest on the sum of $1,991 92, part thereof, from the 19th day of September last until paid or brought into court; and that the defendant Eleanor Dawson, pay or bring into this court to be paid unto the said Josias Hawkins, and Caroline Jlshton Hawkins his wife, the sum of $3,186 11, with interest on the sum of $2,316 61, part thereof, from the 19th day of September last until paid or brought into court; and that the defendant Eleanor Dawson, pay or bring into this court to be paid unto the said Elizabeth Clerklee, the sum of $3,257 90, with interest on the sum of $2,600 77, part thereof, from the 19th day of September last until paid or brought into this court; and that the defendant Eleanor Dawson, pay or bring into this court to be paid unto the said Margaret Clerklee, the sum of $3,296 52, with interest on the sum of $3,016 03, part thereof, from the 19th day of September last until paid or brought into court; and that the defendant Eleanor Dawson, bring into this court the sum of $3,296 52, with interest on the sum of $3,016 03, part thereof, from the 19th day of September last until brought into court to be invested or disposed of as this court shall direct; and to be paid unto the said Sarah Emily Clerklee, on her attaining her full age or on her marriage; or on her death happening before either of those events, to be paid over as this court shall direct. And that the defendant Eleanor Dawson, pay the costs of this suit, to be taxed by the register.
From this decree the defendant Eleanor appealed; upon which the Court of Appeals, by verbal directions caused several accounts to be stated, which accounts and the decree of that court thereupon are as follows:

*300

*301

*302

*303
11th July, 1832.

Court of Appeals.
Earl, Martin and Archer, Judges.
This cause standing ready for hearing, and having been argued by counsel on both sides, was fully heard and considered; and it appearing to the court, that there is manifest error in the decree of the Chancellor passed therein. It is therefore Decreed, that the aforesaid decree be and the same is hereby reversed, each party to bear their own costs in this court; and this court proceeding to give such decree in the premises as ought to have been given by the Chancellor.
It is further Decreed, that there is due from the appellant Eleanor Dawson, executrix of William Dawson, deceased, to the appellee Edmund H. Contee, and Eleanor his wife, the sum of $1,861 25, with interest thereon from the 22d day of January, 1823, until paid. To the appellee Josias Hawkins, and Caroline Ashton his wife, the sum of $1,861 25, with interest thereon from the 22d day of January, 1823, until paid. To the appellee Elizabeth Clerklee, the sum of $1,861 25, with interest thereon from the 3d day of July, 1825, at whieh time she reached her full age of twenty-one, until paid. To the appellee Margaret Clerklee, the sum of $1,861 25, with interest thereon from the 1st day of March, 1828, until paid. And to the appellee Sarah Emily Clerklee, the sum of $1,861 25, with interest thereon from the 12th day of January, 1830, until paid; as the same will more fully appear by accounts C and D herewith filed.
And it is further Decreed, that out of the assets of the said William Dawson, deceased, now in the hands of the said appellant Eleanor Dawson, executrix of the said William, the said appellant Eleanor Dawson, do pay to the said Edmund H. Contee, and Eleanor his wife, the sum of $922 64, with interest thereon from the 22d day of January, 1823, until paid. To the said Josias Hawkins, and Caroline Ashton his wife, the sum of $902 64, with interest thereon from the 22d day of January, 1823, until paid.- To the said Elizabeth Clerklee, the sum of $902 64, with interest thereon from the 3d day of July, 1825, until paid. To the said Margaret Clerklee, the sum of $902 64, with interest thereon from the 1st day of March, 1828, until paid. And to the said Sarah Emily Clerklee, the sum of $902 64, with interest thereon from the 12th day of January, 1830, until paid; and that the said appellant Eleanor Dawson, pay to the said appellees respectively, all the costs incurred by them in the Court of Chancery in the prosecution of this suit; including the costs of the audit in this court
*304 And it is further Decreed, that the said appellant Eleanor Dawson, executrix of William, Dawson, deceased, pay to the said appellees Edmund H. Contee, and Eleanor his wife, Josias Hawkins, and Caroline Ashton his wife, Elizabeth Clerklee, Margaret Clerklee, and Sarah Emily Clerklee, respectively, the residue of the sums of money with interest, which are herein before respectively adjudged to them out of any assets of the said William Dawson, deceased, which since the date of her last administration account have come, or may hereafter come into her hands as executrix or otherwise.
And it is further Decreed, that the said Eleanor Dawson, executrix of William Dawson, deceased, pay into the Court of Chancery to the credit of this cause, the sum of $3,929, with interest thereon until paid in, from the 22d day of January, 1823, agreeably to account E, herewith filed. And in case James Dawson, his executors, or administrators, shall establish his claim, in this cause mentioned, against the estate of the late William Dawson, to the satisfaction of the Chancellor within a reasonable time, to be limited by the Chancellor, then, that the said sum shall be paid over to the said James Dawson, his executors, or administrators; but in case the said James Dawson, his executors, or administrators, shall not establish his claim as aforesaid, then that the said sum shall be distributed by the Chancellor equally among the said appellees Edmund H. Contee, and Eleanor his wife, Josias Hawkins, and Caroline Ashton his wife, Elizabeth Clerklee, Margaret Clerklee, and Sarah Emily Clerklee.
And it is further Decreed, that this cause be and the same is hereby remanded to the Court of Chancery. And the said appellant Eleanor Dawson, executrix of William Dawson, is hereby required from time to time to aecount for all further assets of the said William Dawson which, since the date of her second administration account, have come or shall hereafter come to her hands as executrix aforesaid, or otherwise; which shall be distributed under the Chancellor’s direction in conformity with this decree. And the Chancellor is hereby authorized to pass all such orders as from time to time may be required to carry this decree into effect.
After wThich, Eleanor Contee, Josias Hawkins and wife, Margaret Clerklee, Elizabeth Clerklee, and Sarah E. Clerklee, by their petition, exhibiting therewith, a certified copy of this decree of the Court of Appeals, stated that since the passing of that decree, Edmund H, Contee had died, whereupon his interest had survived *305 to the petitioner Eleanor Contee; whereupon they prayed, that the defendant Eleanor Dawson might be compelled to pay into this court the sum of money aforesaid, with all interest due thereon; that a reasonable time might be appointed for James Dawson, or his representatives to exhibit their claim; and that she be required to render an account of all assets which have come to her hands since the date of her second administration account, and to bring in the same for distribution, and for general relief.
28th September, 1832.
Bland, Chancellor.
It may be well here to observe, that when an appeal is taken from any order or decree of this court, the original record itself remains here; and, as directed by the acts of assembly, a transcript only is transmitted to the Court of Appeals; nevertheless, as before that is done, the party must put upon the record of this court his prayer, or direction for an appeal, the Chancellor is thereby officially informed of the fact. But, in such cases, where the Court of Appeals affirms or reverses the order or decree of this court, or remands the case, as in this instance, with directions that further proceedings be had; or where any thing is left open for the action of this court, after the decision of the Court of Appeals, it has always been usual, and is deemed necessary and sufficient, as the original record remains here, that the party who asks this court again to act, should do so by a petition, exhibiting therewith a copy of the order or decree of the Court of Appeals, thus officially apprising the Chancellor of what had been done in such a manner as to enable him correctly to regulate his further proceedings accordingly, (x) Upon this petition it is, therefore, in obedience to the said decree of the Court of Appeals,
Ordered, that the said Eleanor Dawson, executrix of William Dawson, deceased, on or before the 20th day of November next, bring into this court, the sum of $3,929, with interest thereon, until paid in, from the 22d day of January, 1823. That the term of one year from the date of this order be and the same is hereby limited, as the time within which the said James Dawson is allowed to establish his claim, in this case mentioned, against the estate of the late William Dawson. And that Eleanor Dawson, executrix of William Dawson, be and she is hereby required, to render a full account of the assets of the said William Dawson, which, since the date of her second administration account have come, or shall *306 hereafter come to her hands as executrix or otherwise, up to the 20th day of November next. ■ Provided, that a copy of this order together with a copy of the aforegoing petition be served on the said Eleanor Dawson, on or before the 20th day of October next.
These parties afterwards, by their petition on oath, stated, that, the defendant Eleanor Dawson, had left this stale; was then beyond sea; and the date of her probable return, or the certainty that she ever would return, was not within their knowledge. Whereupon they prayed, that the court would direct that their petition and the order thereupon should be published, warning the said Eleanor Dawson to comply therewith; or that they should have such other relief as might be deemed proper.
15th October, 1832.
Bland, Chancellor.—
Ordered, that the time limited for the said defendant’s bringing into this court the said sum of money, and for rendering an account of the assets be and the same is hereby extended to the 16th day of January next. Provided that a copy of this order, together with a copy of the said order of the 28th day of September last, be published in some newspaper three times a week, for three successive weeks, before the 15th of November next, (y)

 McKim v. Thompson, 1 Bland, 155.

 Grosvenor v. Cartwright, 2 Ca. Chan. 21; Barker v. Wyld, 1 Vern. 140; Wrottesley v. Bendish, 3 P. Will. 237, note ; Legard v. Sheffield, 2 Atk. 377; Wright v. Nutt, 3 Bro. C. C. 339; Beam’s Orders, 29, 180 ; 2 Ev, Potheir Ob. 137.

 McKim v. Thompson, 1 Bland, 155.

 McKim, v. Thompson, 1 Bland, 155.

 McKim v. Thompson, 1 Bland, 155.

 1803, cli. 69.

 1715, ch. 39, s. 15; since altered by 1829, ch. 216, s. 5, and 1831, ch. 305,

 Kill v. Hollister, 1 Wils. 129; Thompson v. Charnock, 8 T. R. 139.

 Mitchell v. Harris, 2 Ves. jun, 135; Nichols v. Chalie, 14 Ves. 265.

 Tattersall v. Groote, 2 Bos. & Pul. 132; Allegre v. Insurance Company, 6 H. & J. 413; Platt on Covenants, 146.

 Co. Litt. 165.

 Street v. Rigby, 6 Ves. 818.

 Street v. Rigby, 6 Ves. 821.

 1778, ch. 21, s. 8.

 2 Harr. Entries. 156, 229.

 Ormond v. Kynnersley, 1 Cond. Chan. Rep. 325; Haggett v. Walsh, 2 Cond. Chan. Rep. 68; Phillips v. Shipley, 1 Bland, 516.
Gardner v. Dick. — This bill was filed on the 25th day of October, 1750, by Jeremiah Gardner and Daniel Legg, assignees of Daniel Dodson, who was assignee of John Peele, a bankrupt, now deceased, against James Dick, James Mowat, and James Nicholson, executors of William Peale, deceased, and William Cummings and Eichard Snowden. The bill alleges, that Samuel Peele and William Peele were largely indebted to John Peele, and being so indebted, William Peele conveyed the greater part of his personal estate, consisting chiefly of negroes, to the defendants, Cummings and Snowden, with intent to defraud his creditors. Whereupon it was prayed, that the defendants, executors of William Peele, might be made to account for the assets which had come to their hands; that the conveyance to Cummings and Snowden might be set aside; that they also might be compelled to account, and that the assets might be applied to the satisfaction of the debt due to the plaintiffs.
*277 The executors put in a joint and separate answer, in which they made some statements as to the assets which had come to their hands; denied having any concern with the conveyance to their co-defendants, and declared that they were ready to account, See. This answer was sworn to by each of these defendants, before one of the justices of the provincial court.
The defendants Cummings and Snowden, put in their joint and separate answer, in which they averred, that the conveyance to them had been made bona fide, for the purpose of indemnifying them against their liability as sureties in an administration bond given by the said William Peele, and that on being indemnified, they were willing to deliver up the property which had been so conveyed to them, &c. This answer was sworn to by the defendant Cummings, on the 16th of February, 1750. And it was ‘affirmed to by Richard Snowden, the other defendant, being one of the people called Quakers, on the 25th of February, 1750,’ before the same justice of the peace.
May, 1752, Sharpe, Chancellor. — Ordered, that this cause -be entered abated, as far as it relates to William Cummings, one of the defendants mentioned in the bill of complaint.
The case having been continued from time to time, was again brought before the court.
February, 1753. — Sharpe, Chancellor.— Ordered, in presence of the counsel on both sides, that this cause be referred to Henry Hall, Bryan Phitpot, Charles Graham and Robert Swan, or any three of them, and that their award be a decree of this court.
After which, on the 26th of September, 1753, the referrees made a report as follows: ‘We, the subscribers, by virtue of an order of the Court of Chancery to arbitrate and determine a suit depending in said court between Jeremiah Gardner, &c. complainants, and James Dick, &c. respondents, do award, order and adjudge, that the said James Dick, James Mowatt, James Nicholson, and Richard Snowden, do pay, or cause to be paid to the said Gardener and Legg, or to Samuel Galloway their attorney in fact, for their use, the sum of £256 6s. 2d. sterling, out of the effects of William Peele aforesaid, in the hands of his executors James Dick, James Mowat, and James Nicholson, being the full balance of accounts due from Samuel Peele and William Peele, deceased, to John Peele, together with the legal costs arising in said suit.’ Whereupon it was prayed, that the said report might stand confirmed.
30/// October, 1753. — Sharpe, Chancellor. — Decreed, that the said report and all the matters and things therein contained, do stand ratified and confirmed, by the order, authority, and decree of this court, to be observed and performed by all parties according to the tenor and true meaning thereof. — Chancery Proceedings, lib. J. R. No. 5, fiol. 1057, 1075.

 Waters v. Taylor, 15 Ves. 10.

 Gibbons v. Dawley, 2 Ca. Chan. 198 ; Powell v. Morgan, 2 Vern. 90; Loyd v. Spillet, 3 P, Will. 346; Morris v. Burroughs, 1 Atk. 404.

 Laws Virginia, 1748, ch. 5, s. 6; 1792, ch. 1; Domat Civil Law, pt. 2, b. 3, tit. 1, s. 1; Code Nap. s. 970; De Sobry v. De Laistre, 2 H. & J. 193.

 Ramsay’s Life Washington, Appendix.

 Webb v. Webb, 1 P. Will. 132.

 Cleaver v. Spurling, 2 P. Will. 526.

 Co. Litt. 35, a.; Hitchcock v. Sedgwick, 2 Vern. 162; Dalbiac v. Dalbiac, 16 Ves. 125; Wimbish v. Tailbois, 1 Plow. 54.

 1791, ch. 73, s. 11.

 1805, ch. 110, s. 12.

 Cooper’s Bank’r Law, Adden. 12, 18; Karnes’ Prin. Eq. b. 3, c. 5, page 455, note 457,

 Cleaver v. Spurling, 2 P. Will. 528.

 Gibson v. Tilton, 1 Bland, 352.

 Kennedy v. Earl of Cassillis, 2 Swan. 322.

 Parsons v. Dunne, 2 Ves. 60; Gason v. Wordsworth, 2 Ves. 325, 336; Minet v. Hyde, 2 Bro, Ch. C. 663; Bourdillon v. Adair, 3 Bro. C. C. 237; Hornby v. Pemberton, Mosely, 58; Campbell v. French, 3 Ves. 321; Garvey v. Hibbert, 1 Jac. and Walk. 180; Thurlt v. Faber, 18 Com. Law Rep. 136; Turnbull v. Moreton, 18 Com. Law Rep. 215.

 Kennedy v. Earl of Cassillis, 2 Swan. 313.
Taylor v. Taylor. — ‘This 5th day of March, 1713, a commission came from Doctors Commons to the honourable the president and council, or any of them, to examine witnesses in a cause depending at said Commons, betwixt John Taylor, of the city of London, merchant, and Mary Taylor, in said Commons, fourteen days’ notice to be given to Robert Bradley, substituted the proctor of the said Mary. His honor Edward Lloyd, Esq. (then Chancellor) Orders, that- summons issue for such evidences as Charles Carroll, Esq. substituted for the proctor of the said John Taylor, shall require.’ — Chancery Proceedings, lib. P. L.fol. 63.

 Omealy v. Newell, 8 East, 372.

 Annesley v. Anglesey, Dick, 90; Chicot v. Lequesne, Dick. 150; Johnson v. Smith, Dick, 592; 2 Fowl. Exch. Pra. 337; Braham v. Bowes, 1 Jac. and Walk. 296; Ex parte Worsley, 2 H. Blac. 275; Dalmer v. Barnard, 7 T. R. 251.

 Omealy v. Newell, 8 East. 372.

 Chancery Proceedings, lib. D. D. No. J. fol. 59.
Prout v. Slater. — On 3d of April, 1799, on the petition of the defendants here to take the answer of one of them who resided in London, a commission was issued to four commissioners or either of them, that they or either of them administer the oath. The answer so taken was certified .by the commissioners, and then certified by a notary public. — Chancery Proceedings, lib. S. H. H. No. 7, fol. 25.

 Hartshorne v. Hands, 2d June, 1795. M. S

 Murdock v. Forrest, 1803, and 1815, M. S; Gibson v. Tilton, 1 Bland, 352.

-v. Lake, 6 Ves. 171;-v. Gwillim, 6 Ves. 285; Bayley v. De Walkiers, 10 Ves. 441; Harding v. Harding, 12 Ves. 159; 1 Harri. Prac. Chan. 285.

 Dagly v. Crump, Dick. 35; Roberts v. Roberts, Dick. 573; Pullen v. Smith, 5 Ves. 21; Freeman v. Fairlie, 3 Meriv. 29; Drewry v. Thacker, 3 Swan, 548; Johnson v. Aston, 1 Cond. Chan. Rep. 38.

 Alsager v. Rowley, 6 Ves. 751.

 Watlington v. Howley, 1 Desau, 167.

 Hancom v. Allen, 2 Dick. 498; Howe v. Earl of Dartmouth, 7 Ves. 137; Hill v. Simpson, 7 Ves. 152; Holland v. Hughes, 16 Ves. 113; Ram, on Assets, 517.

 Co. Litt. 265; Thomas v. Freeman, 2 Vern. 563; Jones v. Roe, 3 T. R. 93.

 Cory v. Gertcken, 2 Mad. Rep. 40.

 Calvert on Parties, 11.

 Chamley v. Lord Dunsary, 2 Seho. & Lefr. 709, 718; Taliaferro v. Minor, 2 Call. 190; Harmood v. Oglander, 8 Ves. 123; Colegate D. Owings’ Case, 1 Bland, 404.

 Gibson v. Bott. 7 Ves. 89.

 Wilson v. Harman, 2 Ves. 673; Hamilton v. Lloyd, 2 Ves. Jun. 416; Paris v. Paris, 10 Ves. 185; Witts v. Steere, 13 Ves. 363; Clancy’s Husb. & Wife, 387.

 Attorney-General v. Scott, 1 Ves. 419; Dethick v. Bradbourne, T. Raym. 5; 1 Harri. Prac. Chan. 677; Bac. Abr. tit. Error, M. 2; Rawlings v. Stewart, 1 Bland, 23, note; Brown v. Brown, 1804, M. S.; Dickson v. Haffner, 1807, M. S.

 1818, ch. 133, s. 1.